Citation/Title
477 F.Supp.2d 392, Richardson v. U.S., (D.Mass. 2007)

***392** 477 F.Supp.2d 392

United States District Court,
D. Massachusetts.

**Joanne RICHARDSON Petitioner,**
**v.**
**UNITED STATES of America Respondent.**

**No. CIV.A. 06-10993-WGY.**
March 19, 2007.

**Background:** Federal prisoner filed motion to vacate her sentence upon conviction of perjury for making false statements to a grand jury, affirmed at 421 F.3d 17.

**Holdings:** The District Court, Young, J., held that:

(1) defense counsel's failure to file supplemental briefs on appeal concerning sudden change in law following *Booker* was objectively unreasonable, as element of claim for ineffective assistance of counsel;

(2) defendant adequately preserved *Booker* issue, for purposes of applying harmless error standard; and

(3) defense counsel's failure to file supplemental briefs on appeal concerning *Booker* prejudiced defendant, and thus amounted to ineffective assistance of counsel.

Motion granted.

Page 9

West Headnotes

[1] Criminal Law 1556

110 ----
110XXX Post-Conviction Relief
110XXX(B) Grounds for Relief
110k1556 Sentence and Punishment.

A district court may grant relief on a motion to vacate in four circumstances: (1) when the sentence was imposed in violation of the Constitution or laws of the United States; (2) when the court was without jurisdiction to impose such sentence; (3) when the sentence was in excess of the maximum authorized by law;

© 2007 Thomson/West. No claim to original U.S. Govt. works.

U.S.C.A. Const.Amend. 6.

[4] Criminal Law 1144.10

110 ----
110XXIV Review
110XXIV(M) Presumptions
110k1144 Facts or Proceedings Not Shown by Record
110k1144.10 Conduct of Trial in General.

On an ineffective assistance of counsel claim, counsel is strongly presumed to

© 2007 Thomson/West. No claim to original U.S. Govt. works.

have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. U.S.C.A. Const.Amend. 6.

[5] Criminal Law 641.13(7)

110 ----
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(7) Post-Trial Procedure and Review.

Defense counsel's failure to file supplemental briefs on appeal concerning sudden change in law following Supreme Court's ruling in *United States v. Booker* , which prohibited upward guidelines adjustments based on judicial fact finding, and severed provision of the Sentencing Guidelines that made them mandatory, was objectively unreasonable, as element of claim for ineffective assistance of counsel, where *Booker* worked a substantial change in applicable law, and counsel's failure to argue *Booker* was an oversight not a tactical decision. U.S.C.A. Const.Amend. 6; U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

[6] Criminal Law 1177

110 ----
110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1177 Sentence and Judgment and Proceedings After Judgment.

Where a *Booker* issue, relating to sentencing under a mandatory Sentencing Guidelines system, is preserved, the Court of Appeals applies the doctrine of harmless error to the district court's application of the Sentencing Guidelines as mandatory. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

[7] Criminal Law 1035(1)

110 ----
110XXIV Review
110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1035 Proceedings at Trial in General
110k1035(1) In General.

The *Booker* issue, relating to sentencing under a mandatory Sentencing Guidelines system, is preserved for review on appeal if the defendant below argued *Apprendi* or *Blakely* error, occurring when a defendant's sentence was enhanced by judicial fact finding beyond that authorized by facts found by the jury or admitted by the defendant, or that the Sentencing Guidelines were

© 2007 Thomson/West. No claim to original U.S. Govt. works.

unconstitutional. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

[8] Criminal Law 1035(1)

110 ----
110XXIV Review
110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1035 Proceedings at Trial in General
110k1035(1) In General.

*Booker* error, relating to sentencing under a mandatory Sentencing Guidelines system, may be preserved when a party suggests the issue but insufficiently develops it and the trial court, on its own initiative, seizes the issue and makes an express ruling on its merits. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

[9] Criminal Law 1042

110 ----
110XXIV Review
110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1042 Sentence or Judgment.

When a *Booker* issue, relating to sentencing under a mandatory Sentencing Guidelines system, is not preserved, the Court of Appeals applies the doctrine of plain error. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

[10] Criminal Law 1035(1)

110 ----
110XXIV Review
110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1035 Proceedings at Trial in General
110k1035(1) In General.

District Court's single reference to *Apprendi*, which required that, other than prior conviction, any fact that increased penalty for a crime beyond statutory maximum prescribed be submitted to jury and proven beyond a reasonable doubt, did not adequately preserve *Booker* issue, relating to sentencing under a mandatory Sentencing Guidelines system, for purposes of harmless error review, where neither defendant nor government had, theretofore, cited to appropriate cases nor suggested the issue. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

[11] Criminal Law 1035(1)

© 2007 Thomson/West. No claim to original U.S. Govt. works.

110 ----
110XXIV Review
110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1035 Proceedings at Trial in General
110k1035(1) In General.

To preserve the issue on appeal and guarantee harmless error review, the party must make some reference to the *Booker* issue, ***392** relating to sentencing under a mandatory Sentencing Guidelines system, either through citation to *Apprendi*, which requires that, other than prior conviction, any fact that increases penalty for a crime beyond statutory maximum prescribed be submitted to jury and proven beyond a reasonable doubt, or *Blakely v. Washington*, which prohibited upward guidelines adjustments based on judicial fact finding, or by raising the issue generally. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

[12] Criminal Law 🔑1035(1)

110 ----
110XXIV Review
110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1035 Proceedings at Trial in General
110k1035(1) In General.

Defendant adequately preserved *Booker* issue, relating to sentencing under a mandatory Sentencing Guidelines system, for purposes of applying harmless error standard on appeal, where defendant contended at sentencing that court was required, under *Apprendi*, which required that, other than prior conviction, any fact that increased penalty for a crime beyond statutory maximum prescribed be submitted to jury and proven beyond a reasonable doubt, to have found a crime occurred before it could refuse her request for an aberrant behavior departure. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

[13] Criminal Law 🔑641.13(7)

110 ----
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(7) Post-Trial Procedure and Review.

Defense counsel's failure to file supplemental briefs on appeal concerning sudden change in law following Supreme Court's ruling in *United States v. Booker*, which prohibited upward guidelines adjustments based on judicial fact finding,

© 2007 Thomson/West. No claim to original U.S. Govt. works.

and severed provision of the Sentencing Guidelines that made them mandatory, prejudiced defendant, and thus amounted to ineffective assistance of counsel, where there was a reasonable probability that during resentencing defendant would garner a lower sentence before another judge. U.S.C.A. Const.Amend. 6; U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

***394** Alexandra H. Deal, Max D. Stern, Stern, Shapiro, Weissberg & Garin, Boston, MA, for Joanne Richardson, Petitioner.

James B. Farmer, United States Attorney's Office, Boston, MA, for United States of America, Respondent.

*MEMORANDUM AND ORDER*

YOUNG, District Judge.

**I. INTRODUCTION**

This is a case abounding in irony. It requires this Court, first, to figure out how the First Circuit would handle evidence of ineffectiveness of counsel--not in proceedings at the trial level--but in prosecuting an appeal before it; and, second, to consider whether petitioner Joanne Richardson ("Richardson") might benefit from re-sentencing before one of my colleagues.

These issues are not the ordinary grist of the district court mill. Yet, in the strange world of federal sentencing today they must be addressed, notwithstanding the indisputable facts that Richardson's trial and sentencing were utterly free from error and she was afforded greater procedural protections than the First Circuit now considers her due.

**II. PRIOR PROCEEDINGS**

The case against Richardson arose out of a more sweeping investigation of TAP Pharmaceutical Products Inc. ("TAP") for alleged Medicaid fraud.

***395** TAP pled guilty on October 16, 2001 and was sentenced to pay a fine of $290,000,000 as well as submitting to numerous corporate oversight procedures as part of a subsequent probationary period. *United States v. TAP Pharmaceutical Products Inc.*, No. 01-cr-10354 (D.Mass. Dec. 10, 2001) (judgment).

The government was far from through.

The government had earlier conferred immunity on Richardson and called her before the grand jury on October 31, 2000 and December 19, 2000 to testify concerning the activities of her superiors, co-workers, and the doctors whom she solicited on TAP's behalf.

On June 25, 2002, the grand jury indicted Richardson for perjury for making false statements to the grand jury. Her case was eventually assigned to this

© 2007 Thomson/West. No claim to original U.S. Govt. works.

session of the Court. *United States v. Richardson*, 421 F.3d 17, 23-25 (1st Cir.2005) (detailing procedural history).

On October 2, 2001, the grand jury had indicted seven other employees of TAP for Medicare fraud. That case was randomly assigned to another session of this Court. A superseding indictment on July 16, 2002 named an additional six defendants. One of the defendants in that case pled guilty and ultimately testified for the government against her co-workers.

Richardson went to trial first. On January 23, 2004, following a seven-day trial, the jury found her guilty of perjury for making false statements to a grand jury but acquitted her of obstruction of justice.

Later, in the spring of 2004, this Court became convinced that the mandatory United States Sentencing Guidelines ("Guidelines") were unconstitutional and at once began building in additional procedural protections for defendants. On June 18, 2004, five days before the Supreme Court decided *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), this Court held the mandatory Guidelines unconstitutional for marginalizing the jury's fact finding function. *United States v. Green*, 346 F.Supp.2d 259 (D.Mass.2004). Buoyed by *Blakely*, this Court promptly proceeded to "*Blakely*ize" the Guidelines, requiring submission of sentencing enhancing factors to the jury in each subsequent criminal case (FN1) in an effort to harmonize the then-mandatory Guidelines with the Constitution's structural requirement of trial by jury. U.S. Const., Art. III, § 2, cl. 3 ("The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury ...."); *see* Robert J. Anello & Jodi Misher Peikin, *Evolving Roles in Federal Sentencing: The Post Booker/Fanfan World*, 1 Fed. Cts. L.Rev. 301, 334-35 (2006) [hereinafter, *Evolving Roles* ] (discussing "*Blakely*ization"). This Court's procedural approach was well known to the Office of the United States Attorney and the local criminal defense bar during this period. (FN2)

***396** Richardson was sentenced on April 29, 2004. Because her case involved no sentencing enhancement factors, this Court focused on the then-mandatory Guidelines and sentenced Richardson to six months in prison, followed by two years of supervised release, the first four months of which was to be served in home confinement. Richardson's sentence also included a fine of $3,000 and a special monetary assessment of $100. This sentence was somewhat higher than the bottom of the applicable Guidelines range. The Court did, however, stay the execution of this sentence pending her appeal.

Richardson promptly appealed. The First Circuit heard oral argument on her appeal nine days before the decision of the Supreme Court in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). On August 30, 2005, the First Circuit affirmed Richardson's conviction. 421 F.3d 17.

Meantime, the government had pressed on with its case against the other TAP personnel. Extensive pre-trial proceedings followed in which the court severed one defendant from the others. A thorough fifty-two day trial followed against 11 defendants, during which three defendants were acquitted or dismissed. After

© 2007 Thomson/West. No claim to original U.S. Govt. works.

three days of deliberation, the jury acquitted the remaining eight defendants. *United States v. MacKenzie, et al.*, No. 01-cr-10350 (D.Mass. July 14, 2004) (verdict). Thereafter, the district judge presiding allowed the cooperating defendant to withdraw her plea. *United States v. Chase*, No. 01-cr-10350 (D.Mass. Sept. 14, 2004) (vacating guilty plea). The final defendant, who had been severed from the others, pled guilty and was sentenced. *United States v. Romano*, No. 01-cr-10350 (D.Mass. Feb. 16, 2005) (judgment).

**III. DISCUSSION**

On January 12, 2005, the Supreme Court issued its decision in *Booker*, dramatically altering the constitutional status of the Guidelines. This Court has already discussed the complexities of the Supreme Court's dual holdings in *Booker* and need not do so again here. (FN3) Despite these complexities, the Supreme Court held in *Booker*, inter alia, the mandatory nature of the Guidelines unconstitutional and made the Guidelines advisory.

One of the many questions that arose out of *Booker* was the status of all those individuals whose convictions had become final during the time when the Guidelines were mandatory. The First Circuit has ***397** now decided this issue, holding that *Booker* does not apply retroactively. *Cirilo-Munoz v. United States*, 404 F.3d 527, 533 (1st Cir.2005). A second question *Booker* raised was whether an individual convicted pre-*Booker* who has not exhausted his or her final appeal may use the change in the status of the Guidelines as a basis for appeal. In *United States v. Martins*, 413 F.3d 139, 153-54 (1st Cir.2005), the First Circuit set forth a framework governing analysis of such situations. Thus, the law is largely settled with respect to these two questions.

The present case, however, presents a unique situation involving a petition for resentencing under 28 U.S.C. § 2255 that alleges ineffective counsel for failure to raise the new status of the Guidelines *on appeal*.

In her present habeas petition, 28 U.S.C. § 2255, Richardson claims that her attorney, Jeremy Margolis ("Margolis"), provided ineffective assistance of counsel at trial and on appeal. Mem. in Supp. of Def.'s Motion for Relief Pursuant to 28 U.S.C. § 2255 [Doc. No. 2] ("Petition"). In response, the government argues Richardson does not meet her burden of proving ineffectiveness of counsel. Government's Opposition to Def.'s Motion for Relief Pursuant to 28 U.S.C. § 2255 [02-cr-10211, Doc. No. 222].

During the hearing on this petition, Richardson narrowed the scope of her petition simply to argue that her counsel's failure to argue *Booker* on appeal resulted in ineffective assistance of counsel. While the fact pattern surrounding Richardson's motion--namely that *Booker* was decided during her appeal and her counsel failed to argue this change in the law--is somewhat novel, the First Circuit's framework in *Martins* provides guidance for this Court.

**A. Ineffective Counsel Claims Under 28 U.S.C. § 2255**

© 2007 Thomson/West. No claim to original U.S. Govt. works.

[1] A district court may grant relief under 28 U.S.C. § 2255 in four circumstances. First, when "the sentence was imposed in violation of the Constitution or laws of the United States." *Hill v. United States*, 368 U.S. 424, 426, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962). Second, when "the court was without jurisdiction to impose such sentence." *Id.* Third, when "the sentence was in excess of the maximum authorized by law." *Id.* at 426-27, 82 S.Ct. 468. Fourth, when "the sentence is otherwise subject to collateral attack." *Id.* It is the fourth circumstance that this Court must address in the present case. Richardson alleges that Margolis' failure to file supplemental briefs concerning *Booker* constituted ineffective assistance of counsel and violated her Sixth Amendment rights.

[2][3][4] A claim under 28 U.S.C. § 2255 is subject to the "cause and actual prejudice standard" when the petitioner failed to make a timely objection. *United States v. Frady*, 456 U.S. 152, 167, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Cause and prejudice, however, need not be shown when the underlying claim alleges ineffective assistance of counsel. *Smullen v. United States*, 94 F.3d 20, 23 (1st Cir.1996) (*citing Knight v. United States*, 37 F.3d 769, 774 (1st Cir.1994)). Judicial review of an ineffective assistance claim is highly deferential and every effort must be made "to eliminate the distorting effects of hindsight." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. 2052.

To prevail on an ineffective assistance of counsel claim, a petitioner must demonstrate: ***398** (1) deficient performance by counsel that (2) caused prejudice to the petitioner. *Id.* at 687, 104 S.Ct. 2052. Deficiency of counsel is demonstrated when the representation falls "below an objective standard of reasonableness." *Id.* at 687-88, 104 S.Ct. 2052. The "wide range of professionally competent assistance" governs the parameters of reasonableness. *Id.* at 690. *Strickland* does not define with any detail what is reasonable under the Sixth Amendment. It does, however, state that "[r]epresentation of a criminal defendant entails certain basic duties." *Id.* at 688, 104 S.Ct. 2052. Attorneys have "the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Id. Strickland* also stresses that attorneys have significant discretion in making tactical decisions and that the Sixth Amendment is not intended to improve the quality of legal representation but to ensure that individuals receive a fair trial. *Id.* at 689, 104 S.Ct. 2052. "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* (*quoting Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). It is, therefore, for this Court to decide whether Margolis' decision not to file supplemental briefs concerning *Booker* was a tactical choice and whether in pursuing this course of action, he failed to advocate Richardson's cause by not "bring[ing] to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.* at 688, 104 S.Ct. 2052.

© 2007 Thomson/West. No claim to original U.S. Govt. works.

[5] The scale and scope of the *Booker* sea change was of such magnitude that Margolis' failure to file a supplemental brief was objectively unreasonable. *Booker* was of an "unexpected nature," *Martins*, 413 F.3d at 152, and worked "a substantial change in the applicable law," *United States v. Vazquez-Rivera*, 407 F.3d 476, 487 (1st Cir.2005). Given this sudden change in the law, Margolis' failure to argue *Booker* cannot be said to be tactical. A tactical decision occurs where one argument is foregone to save time and energy to make another argument. A tactical decision can also occur where an attorney believes an argument to be so weak that the attorney does not want to jeopardize the judge's view of the case by raising the argument. Margolis did not refrain from raising *Booker* because he wanted to save the court's time and Richardson's money in order successfully to argue another point. Margolis also had at least a plausible argument that Richardson would have been sentenced differently post-*Booker*. *See, e.g., United States v. Wilkerson*, 411 F.3d 1, 10 (1st Cir.2005) (allowing defendant to file supplemental briefs and then remanding to the district court for resentencing under the plain error standard); *United States v. Gomez-Rosario*, 418 F.3d 90, 109 (1st Cir.2005) (holding that under the circumstances the harmless error test required resentencing). Margolis' failure to argue *Booker* was unreasonable as it was an oversight not a tactical decision and could never "be considered sound trial strategy." *Michel*, 350 U.S. at 101, 76 S.Ct. 158.

Because Margolis provided Richardson with deficient representation, this Court must determine if the deficiency resulted in prejudice to her. *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. To do so, Richardson must ultimately demonstrate that were it not for Margolis' errors, there would have been a reasonable probability that she would have been sentenced differently. "A reasonable probability is a probability ***399** sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

Here, however, Margolis committed his deficient representation during Richardson's appeal rather than during her trial. Therefore, it is necessary to analyze whether there is a reasonable probability that, had the issue been raised in a post-hearing brief, the First Circuit would have remanded the case to this Court for resentencing. It is first necessary to determine what type of review the First Circuit would have accorded to this Court's sentencing of Richardson had Margolis provided reasonable representation.

**B. Preserving the *Booker*-Issue**

[6][7][8][9] Where a *Booker* issue is preserved, the First Circuit applies the doctrine of harmless error to the district court's application of the Guidelines as mandatory. *United States v. Anderson*, 452 F.3d 87, 92 (1st Cir.2006). The *Booker* issue is preserved "if the defendant below argued *Apprendi* or *Blakely* error or that the Guidelines were unconstitutional." *Antonakopoulos*, 399 F.3d at 76. *Booker* error may also be preserved when a party suggests the issue but insufficiently develops it and "the trial court, on its own initiative, seizes the issue and makes an express ruling on its merits." *Martins*, 413 F.3d at 153. Where, however, a *Booker* issue is not preserved, the First Circuit applies the

© 2007 Thomson/West. No claim to original U.S. Govt. works.

doctrine of plain error. *Antonakopoulos*, 399 F.3d at 75.

[10] Richardson argues that both she and the Court preserved the *Booker* issue during the sentencing hearing. She argues *Booker*-issue was preserved by the discussion of *Apprendi* at two different points during the sentencing hearing. Only one of these discussions of *Apprendi*, however, adequately preserves the *Booker* issue.

[11] The Court first mentioned *Apprendi* at sentencing. Transcript of Sentencing, April 29, 2004 [Doc. No. 194] ("Tr.S.") at 30. Rather, to preserve the issue on appeal and guarantee harmless error review, the party must make some reference to the *Booker* issue, either through citation to *Apprendi* or *Blakely* or by raising the issue generally. *Martins, id.* at 153 (appearing to require that the party at least suggest the issue before the Court can "seize[ ] the issue"). Since the Court first mentioned *Apprendi* entirely on its own and neither Richardson nor the government had, theretofore, cited to appropriate cases nor suggested the issue, the Court's single reference did not adequately preserve the *Booker* issue for the purposes of harmless error review.

[12] Richardson then argued that, under *Apprendi*, the Court couldn't find any additional facts of whether there was a dishonest scheme at Lahey Clinic. Tr.S. at 44. In response to Richardson's argument, the Court noted that Richardson was arguing that a court may not find facts that reduce her sentence, while *Apprendi* prohibits a court from finding facts that increase a sentence beyond what the facts found by a jury dictate. Richardson, nonetheless, contended that *Apprendi* required the Court to have found a crime had occurred at the Lahey Clinic before it could refuse her request for an aberrant behavior departure. *Id*. The Court thus holds that Richardson adequately preserved the *Booker* issue for the purpose of applying the harmless error standard. Contrary to the government's argument, Richardson's reference to *Apprendi*, Tr.S. at 44, directly raises the issue "within the encincture of the constitutional concerns raised in *Apprendi*, *Blakely*, and *Booker*," *Martins*, 413 F.3d at 153, i.e., the constitutional concern being that "the Sixth Amendment required jurors to determine ***400** facts that were necessary to the imposition of a certain sentence," *id.*

This holding--that the *Booker*-issue is preserved--is grounded in the First Circuit's generous preservation standard. "In light of the unexpected nature of *Booker* 's holding that the sentencing guidelines must be treated as advisory, we have been fairly liberal in determining what sorts of arguments sufficed to preserve claims of *Booker* error in pre-*Booker* cases." *Martins*, 413 F.3d at 152. "The court has offered to treat almost any colorable claim in the district court as preserving the *Booker* issue and avoiding plain error requirements." *United States v. Heldeman*, 402 F.3d 220, 224 (1st Cir.2005). While Richardson could have made the *Apprendi* argument more directly, her argument was sufficient to meet the First Circuit's liberal standard for preserving *Booker* error as articulated in *Martins* and *Heldeman*.

This Court must, therefore, review the proceedings in the First Circuit for

© 2007 Thomson/West. No claim to original U.S. Govt. works.

harmless error. *Anderson,* 452 F.3d at 92.

**C. Harmless Error Review**

[13] Under the harmless error standard:

> The government has the burden of establishing that the preserved *Booker* error was harmless. 'The standard of proof, however, depends on whether the error is conceived of as constitutional.' If the error is constitutional in nature, 'the government has the burden of proving beyond a reasonable doubt that the error did not affect the defendant's substantial rights.' If the error is not constitutional in nature, the government has the burden of demonstrating the absence of any 'grave doubt' regarding the harmlessness of the error.

*Id.* at 92-93 (citations omitted). Richardson's "substantial right" here is her right to have a proper sentencing under the law. *See United States v. Wallace,* 461 F.3d 15, 44 (1st Cir.2006) (holding that an error in departing from the Guidelines affects a defendant's substantial rights). Thus, the *Booker*-issue in this case was of a constitutional nature. However misplaced, Sixth Amendment concerns are present in Richardson's argument that under *Apprendi,* a jury must find the Lahey Clinic guilty of a crime in order for this Court to refuse her request for an aberrant behavior departure. The government, therefore, has the burden of proving beyond a reasonable doubt that the failure to raise the *Booker* issue on appeal did not affect Richardson's right to a proper sentence under the law.

With the case in this posture, the government makes a practical common sense argument. "There is no prejudice here nor can there be," says the government in effect, "because even if the Court of Appeals were to apply the analysis just explicated and remand the case to the district court, as the sentencing judge you know very well that, in this case, you would impose the same sentence post-*Booker* as you did pre-*Booker,* especially since your *Apprendi, Blakely,* and *Booker* concerns are primarily procedural and not directed to the resulting guideline range and here, moreover, you didn't sentence at the bottom of the guidelines range and there is not a scintilla of evidence that you doubted that your sentence was in every respect fair and just." *See* Response at 5-7.

The Court expresses no opinion whatever as to this argument because, if there is to be a re-sentencing in this case, I will not conduct it unless ordered to do so by the Court of Appeals. To understand why, consider the proceedings in *United States v. Gonczy,* 357 F.3d 50 (1st Cir.2004).

**1. *United States v. Gonczy***

The procedural and factual setting in *United States v. Gonczy* is simply stated. ***401** Charged with conspiracy, mail, and wire fraud, Gonczy pleaded guilty under a plea agreement in which the government agreed to recommend a sentence at the low end of the guideline range. *Id.* at 51. At sentencing,

© 2007 Thomson/West. No claim to original U.S. Govt. works.

however, government counsel rehearsed the magnitude and culpability of Gonczy's involvement in the conspiracy. *Id.* at 53-54. As the presiding judge, I chided government counsel for undercutting the plea agreement and she toned it down. *Id.* at 54. I then imposed a guideline sentence higher than called for in the plea agreement. *Id.* at 51. The First Circuit reversed, holding that the government improperly had violated its plea agreement. *Id.* at 54.

I remembered thinking when the Court of Appeals opinion issued that it was gratifying to have a strong opinion on grounds I had suggested myself. I gave instructions that, pursuant to Local Rule 40.1(K), (FN4) Gonczy's case was to be redrawn to another district judge upon issuance of the mandate.

Then the mandate issued.

Although nothing in the opinion suggested any judicial misconduct in the conduct of Gonczy's plea or sentencing nor is there any hint anywhere in the record that I could not properly apply Local Rule 40.1(K), the mandate stripped me of any further jurisdiction in Gonczy's case. Mandate [01-cr-10055, Doc. No. 395] ("Re-sentencing must be held before a new trier.").

Judge Woodlock has provided a careful and balanced analysis of the First Circuit's sporadic practice of ordering district judges off a case. *Danaipour v. McLarey,* No. 01-11528-DPW, slip op. at 5-8 (D.Mass. Sept. 10, 2003). It is appropriate here to observe only that the *Gonczy* mandate is the most severe professional rebuke I have received in nearly thirty years of judicial service.

I immediately set about revising my procedures so that I would never again be subject to such a rebuke. Forthwith, I resolved on an invariable rule that any resentencing after appeal would be redrawn to another district judge unless the First Circuit specifically ordered me to conduct such resentencing. From that day to this, whenever I impose sentence I recite this practice as part of informing a defendant of his right to appeal. (FN5) Indeed, in every post-*Booker* case where the Court of Appeals has ordered resentencing as to a pre-*Booker* sentence, I have ordered the case redrawn pursuant to Local Rule 40.1(K). *See, e.g., United States v. Green,* 02-10054-WGY (redrawn to Chief Judge ***402** Wolf) (FN6); *United States v. Olivero,* 01-10469-GAO (redrawn to Judge O'Toole); *United States v. Cabrera,* 01-10469-GAO (redrawn to Judge O'Toole).

So it must be here. This is not a personal conceit. This case involves, not matters internal to the district court, but rather a legal analysis concerning what the First Circuit will do about the allegedly ineffective assistance of counsel before it. Richardson deserves no less.

**2. Sentencing Practices Within the District of Massachusetts**

The question of potential prejudice persists, however. Absent a reasonable probability that during resentencing Richardson will garner a lower sentence before another district judge sitting in Boston, (FN7) she has suffered no prejudice and this habeas petition must be denied.

© 2007 Thomson/West. No claim to original U.S. Govt. works.

To assess this probability, this Court necessarily turns to a consideration of the sentencing practices of my Boston colleagues--and immediately faces a quandary.

Although the imposition of a criminal sentence is central to the role of a trial judge and ought necessarily be the most public and accountable of a judge's many responsibilities, sadly the United States Judicial Conference and the Sentencing Commission have today cast a nearly impenetrable pall of secrecy over the entire sentencing process such that it is difficult, if not impossible, to determine from publically available materials the sentencing track record of individual district judges. *See Kandirakis,* 441 F.Supp.2d at 333 n. 76 (detailing this phenomenon, noting the collapse of public confidence it engenders, and the aversion of the District of Massachusetts to such unwarranted secrecy).

This is not mere happenstance. This "circle the wagons" attitude is well thought out. Nothing better illustrates the long retreat from genuine judicial independence in the federal courts than the fact that today the institutional judiciary seeks to submerge the sentencing track records of individual judges in a sea of court-wide statistics in the forlorn hope that by so doing, individual judges may be spared unwarranted personal attacks. It doesn't work, of course. *See, e.g.,* Amanda Bronstad, *Light Terms for Child Porn Blasted,* National L.J., Jan. 15, 2007, at 1; Lynette Clemetson, *Judges Look to New Congress for Changes in Mandatory Sentencing Laws,* N.Y. Times, Jan. 9, 2007, at A12. What's more, it fosters stereotypical thinking so frequently wide of the mark as to obfuscate discerning analysis. (FN8) "But let that bide." (FN9)

**a. Publicly available data**

Materials made available by the Sentencing Commission confirm that today, as ever, all sentencing is local. (FN10)

> ***403** On one point at least the drop in the national guidelines compliance rate is an accurate reflection of the state of the entire federal system--the post-*Booker* decline in within-range sentences was nearly universal.... (FN11)
>
> Among the vast majority of districts in which compliance declined, some experienced only minor drops, but in others the change was dramatic. For example, in the Eastern District of Wisconsin, the percentage of sentences within range fell 31.8% between 2004 and 2005, from 84.7% to 52.9%; *the rate in Massachusetts fell 28.1%, from 79.7% to 51.6%.* (FN12)

*Year of Jubilee, supra,* at 298-99 (citations omitted) (emphasis added).

Beyond the general data, I can think of only three public, judge-specific sentencing references within this district.

The first, derived from the Almanac of the Federal Judiciary, is of little help, although it does make a stab at comparative analysis. From its published

© 2007 Thomson/West. No claim to original U.S. Govt. works.

welter of conflicting, ad hominem comments, it suggests that the judges to whom this case may be redrawn fall into various categories, viz. "down-the-middle"; "fair"; "fair, but tough" (for comparison purposes, this is the cohort in which the Almanac places me); "follows the guidelines"; "pro-government"; and "tough." 1 Almanac of the Federal Judiciary 12-36 (Aspen Publishers 2006). Regrettably, these categories are too vague and general to be of much help.

Second, in the heady days immediately following *Booker,* the Center for Advanced Legal Studies at Suffolk University Law School convened a symposium on sentencing. Among the panelists were Judge Paul Barbadoro of the District of New Hampshire, Judge Nancy Gertner, and me. Judge Gertner spoke generally to make the point that, post-*Booker,* district judges when sentencing could now be arrayed along a spectrum from "free at last, free at last," which she illustrated by the decisions ***404** of Judge Lynn Andelman of the Eastern District of Wisconsin, to "business as usual," which she illustrated by the decisions of Judge Paul Casell of the District of Utah. (FN13) I spoke in favor of increased procedural protections during sentencing hearings. Framed by Judge Gertner's remarks, the discussion then turned to a frank evaluation predicting how specific judges in the District of Massachusetts would react to *Booker.* I recall putting two judges in the "free at last, free at last" category, another two in the "business as usual" class and clustering the remainder somewhere in the middle. The discussion was sufficiently informed and informative that I repeated it at the Recent Developments in Federal Law lecture at the Annual Meeting of the Massachusetts Bar Association.

These initial predictions need to be revised, of course, since thereafter the circuit courts moved almost in lockstep to shore up the now thoroughly discredited Sentencing Guidelines. Probably, they have gone too far in that direction. *Cf. Cunningham v. California,* --- U.S. ----, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007). Today, the guidelines are "mandatory in all but name" in many circuits. The First Circuit has not gone quite that far, although it has *en banc* commanded "substantial weight" to the guidelines, *United States v. Jimenez-Beltre,* 440 F.3d 514, 516-18 (1st Cir.2006) (rejecting the more nuanced views of Judge Lipez at 440 F.3d at 524). Further, the First Circuit has forbidden district judges from questioning guideline terms, *see United States v. Pho* 433 F.3d 53, 62-65 (1st Cir.2006), and has established at least one arithmetic parameter, *United States v. Thurston,* 456 F.3d 211, 220 (1st Cir.2006) (ordering the district court to impose a sentence of not less than 36 months absent extraordinary developments), that many find arbitrary.

How is this all playing out in the District of Massachusetts? (FN14) A partial answer is found in *The U.S. District Court Speaks* (4th ed.2006), a publication of Massachusetts Continuing Legal Education ("MCLE") that compiles the answers of most judges to an exhaustive questionnaire concerning practices and procedures in this District. The answers to a number of questions offer clues as to individual approaches to post-*Booker* sentencing. One such series of responses is especially pertinent here:

*What weight do you generally give to the sentencing guidelines?*

© 2007 Thomson/West. No claim to original U.S. Govt. works.

WOLF, C.J.: Appropriate weight.

TAURO, J.: I always consider the guidelines.

ZOBEL, J.: I always start with the guidelines, and they do carry weight.

WOODLOCK, J.: (FN15)

GORTON, J.: Heavy weight.

SARIS, J.: [No direct answer]

STEARNS, J.: First consideration.

LINDSAY, J.: I give such weight to the Sentencing Guidelines as Supreme Court and First Circuit precedent require.

***405** GERTNER, J.: I regard the sentencing guidelines as one set of standards that I must consider; there are other standards/rules as well. *See United States v. Jaber,* 362 F.Supp. [2d] 365 (D.Mass.2005) (CRIM. No. 02-10201-NG); *U.S. v. Mueffelman,* 400 F.Supp.2d 368 (D.Mass. Nov.14, 2005) (CRIM. No. 01-10387-NG); *U.S. v. Malouf,* 377 F.Supp.2d 315 (D.Mass. June 14, 2005) (CRIM. No. 03-CR-10298-NG); *U.S. v. Pimental,* 367 F.Supp.2d 143 (D.Mass. Apr.21, 2005) (CRIM. No. 99-10310-NG); "Sentencing Reform: When Everyone Behaves Badly," Judge Nancy Gertner, 57 *Me. L.Rev.* 569 (2005); "What Yogi Berra Teaches About Post-Booker Sentencing," Nancy Gertner, *The Pocket Part of Yale Law Journal* http://7/8www.7/8yalelawjournal.7/8org/7/8archive.7/8asp (July 3, 2006).

O'TOOLE, J.: I give the guidelines the consideration they deserve under the statutes and case law.

LASKER, J.: (FN16)

*Id.* at 268-69, 125 S.Ct. 738.

What can we make of all this? Does Judge Gorton's "Heavy weight" portend a more severe approach to sentencing than Judge Tauro's admission that he will "always consider" the Guidelines? Does Judge Gertner's nuanced and thorough answer, not to mention her probing sentencing opinions cited in her questionnaire answer, bespeak a willingness to depart downward that outstrips her colleagues? (FN17) "The obvious answer is that we don't know.... We just don't know." *United States v. Serrano-Beauvaix,* 400 F.3d 50 (1st Cir.2005) (Lipez, J., concurring) (quoting *United States v. Rodriguez,* 398 F.3d 1291, 1301 (11th Cir.2005)) (discussing "[t]he difficulty of reconstructing a hypothetical sentencing decision").

**b. Confidential data**

© 2007 Thomson/West. No claim to original U.S. Govt. works.

There are other data of course, and I am privy to it. It is confidential. From this data I conclude that, were Richardson to be resentenced before one of my Boston colleagues, she stands a slightly less than even chance of obtaining a reduced sentence. This is, however, more than sufficient to establish a "reasonable probability" that Richardson has been prejudiced by Margolis' ineffective assistance on appeal and the writ of habeas corpus must therefore issue. (FN18)

***406. III. CONCLUSION**

For the reasons alluded to above, this Court grants the writ of habeas corpus, vacates Richardson's sentence, and, pursuant to Local Rule 40.1(K), orders this case redrawn for resentencing before another district judge at the expiration of 60 days from the date hereof.

SO ORDERED.

(FN1.) This is essentially the approach adopted by the broadest bipartisan coalition of jurists, practitioners, and scholars, *see generally Toward Real Reform: The Constitution Project Recommendations;* Model Federal Sentencing Guidelines, 18 Fed. Sentencing Rptr. 314-15 (2006), and a number of states that have seriously considered the issue. *See Cunningham v. California,* 127 S.Ct. 856, 871 & n. 17 (2007); *Jennifer Yi, Cunningham v. California: The Future of Sentencing Jurisprudence,* http://7/8www.7/8socialaw.7/8com/7/8slbook/7/8judgeyoung7/807/7/8097/8yifinalpaper.7/8pdf (last visited Mar. 16, 2007).

(FN2.) While awaiting the Supreme Court's decision [in *Booker* ], district court judges in this district have taken a variety of positions on these issues. A number have issued written rulings: Judges Gertner and Harrington have ruled that *Blakely* applies to the guidelines, that the unconstitutional portions may not be severed from the rest, and that in-determinate sentencing applies. *United States v. Mueffelman,* 327 F.Supp.2d 79 (D.Mass.2004), *United States v. Sisson,* 326 F.Supp.2d 203 (D.Ma.2004). Judge Keeton has found that *Blakely* applies to the guidelines, enhancements are barred (if facts not found by a jury or agreed to), but the guidelines are severable. *United States v. Moran,* 02-10136. In a pre-*Blakely* opinion, Judge Young found the guidelines un-constitutional but severable. *United States v. Green,* No. 02-10054. Judge Wolf has found that *Blakely* does not apply to the guidelines. *United States v. Walters,* No. 03-10308.

Anecdotally, this office has heard that Judges Gorton, O'Toole, Stearns, Tauro, and Woodlock have ruled that *Blakely* does not apply to the guidelines.... Judge Ponsor has ruled that *Blakely* applies and the guidelines are severable. Judges Lindsay and Saris have ruled that *Blakely* applies, the guidelines are not severable, and indeterminate sentencing applies. Judge Zobel's view is reported to be that *Blakely* may well apply to the guidelines. *US v. Mikutowicz,* 2004 WL 1557280 (D.Mass.2004).

© 2007 Thomson/West. No claim to original U.S. Govt. works.

29 Fed.Crim. Def. Update 1 (Oct.2004).

(FN3.) *See generally United States v. Kandirakis*, 441 F.Supp.2d 282 (D.Mass.2006) (discussing the First Circuit's decisions that have interpreted *Booker* 's dual holdings, including *United States v. Jiménez-Beltre*, 440 F.3d 514 (1st Cir.2006); *United States v. Pho*, 433 F.3d 53 (1st Cir.2006); and *United States v. Antonakopoulos*, 399 F.3d 68 (1st Cir.2005)).

(FN4.) LR 40.1(K) Proceedings after Appeal.

(1) When an appellate court remands a case to this court for a new trial, the case shall be reassigned to a judge other than the judge before whom the first trial was held.

(2) In all other cases in which the mandate of the appellate court requires further proceedings in this court, such proceedings shall not be conducted before the judge before whom the prior proceedings were conducted unless the terms of the remand require that further proceedings be conducted before the original judge or unless the judge determines that there will result a substantial saving in the time of the whole court and that there is no reason why, in the interest of justice, further proceedings should be conducted before another judge. If the judge before whom the prior proceedings were conducted does not retain the case for further proceedings, that judge shall return it to the clerk for reassignment. *Effective September 1, 1990; amended effective January 1, 2001.*

***406**_ (FN5.) Evidently, such an ironclad procedure is having the desired effect. Following the issuance of the opinion ordering a new trial in *United States v. Pacheco*, 434 F.3d 106 (1st Cir.2006), I received a call from the First Circuit concerning whether I would order the case redrawn. I assured the caller I would.

(FN6.) Chief Judge Wolf requested that I do the resentencing in *Green*. I agreed, given the special circumstances of that case.

(FN7.) When a criminal case is ordered redrawn, the random draw will select among the 10 remaining active judges sitting in Boston and the one senior district judge presently hearing criminal cases. Local Rule 40.1(A)(3).

(FN8.) A case in point is the misapprehension that Judge Gertner leads this Court in downward departures. *See* note 17, *infra*.

(FN9.) *See Miara v. First Allmerica Financial Life Ins. Co.*, 379 F.Supp.2d 20, 69 n. 57 (D.Mass.2005).

(FN10.) The Sentencing Guidelines may somewhat have reduced sentencing disparity within individual circuits. The circuits, however, took such widely different approaches to sentencing, that there has never been nationwide uniformity in sentencing. *See, e.g.*, Michael O'Hear, *The Myth of Uniformity*,

© 2007 Thomson/West. No claim to original U.S. Govt. works.

17 Fed. Sentencing Rptr. 249 (2005). It is arrant nonsense to believe otherwise. Indeed, the Guidelines are today virtually ignored in the District of Arizona (Guideline compliance rate of 28.6%) and the Eastern District of New York (Guideline compliance rate of 34.9%), districts swamped by drug and immigration cases. Frank O. Bowman, III, *Year of Jubilee ... or Maybe Not: Some Preliminary Observations About the Operation of the Federal Sentencing System after* Booker, 43 Hous. L.Rev. 279, 299 (2006) [hereinafter, *Year of Jubilee* ]. As Judge Gerard E. Lynch cogently explained, "In fact, there are lots of different fast-track programs in lots of different districts, and they are all different. In some places you get four levels, in some you get one, in some you get two, and it has a lot to do with what it takes to get enough guilty pleas to clear the dockets and stop using so many government resources. So it is quite a remarkable little piece of disparity in its own right." *Federal Sentencing under "Advisory" Guidelines: Observations by District Judges*, 75 Fordham L.Rev. 1, 27-28 (2006) [hereinafter "*Sentencing Observations* "].

(FN11.) This unequivocal finding causes Professor Bowman to conclude:

[S]omeone needs to remind federal policymakers of an obvious truth--if laws are widely and persistently evaded by the very officials assigned to enforce them, at some point one should start questioning the wisdom of the laws rather than the fidelity of the enforcers. In the end, one very good way to promote guidelines compliance is to write guidelines that call for outcomes those who run the system are happy to accept.

*Year of Jubilee, supra,* at 323.

(FN12.) The Sentencing Guidelines statistics for the District of Massachusetts cited by Professor Bowman are, in actuality, seriously flawed. Through a combination of reporting errors, categorization errors by Commission staff, and the Commission's obdurate refusal even to look at the opinions, transcripts, and detailed orders that explain actual sentences in this District, the reported departure rate is significantly overstated. Because communications between this Court and the Commission are confidential, however, I cannot further explain. "Trust me on this. I know this stuff." *See* note 18, *infra.*

(FN13.) Judge Gertner gave a version of the same speech at that year's Sentencing Institute. She made no specific mention of the District of Massachusetts. The Institute of Advanced Legal Studies maintains a record of the entire presentation it sponsored. A CD-ROM copy of that record is on file in chambers.

(FN14.) Judge Selya is famously said to have remarked, upon hearing a post-*Booker* sentencing appeal from the District of Massachusetts, that the judges of this District were engaged in "guerilla war" against the guidelines.

***406**_ (FN15.) Judge Woodlock responded to the questionnaire but MCLE neglected

© 2007 Thomson/West. No claim to original U.S. Govt. works.

to incorporate his responses.

(FN16.) Judge Lasker is a senior district judge in the Southern District of New York who sits permanently in this District. He was not afforded the opportunity to respond to the questionnaire.

(FN17.) Actually, it does not. Judge Gertner, a "noted jurist," *Evolving Roles, supra*, at 332, has a downward departure rate that is mid-range among the judges of this District. She perhaps best exemplifies Justice Breyer's vision that the Sentencing Guidelines ought build a true common law of sentencing upon well reasoned departures. It is not his fault (nor hers) that in practice the Sentencing Guidelines have failed so abysmally. For an accurate, succinct discussion of the reasons why, see Judge Gertner's comments in *Sentencing Observations, supra*, at 5-6.

I hasten to add that, as the conclusion expressed just above rests on confidential data, *see* note 18, *infra*, I have Judge Gertner's express permission to discuss her sentencing practices.

(FN18.) This is perhaps the most inadequate excuse for legal reasoning I have ever penned. It amounts to nothing more than--"Trust me on this. I know this stuff."

While our society may yet come to approve Military Commissions acting upon such reasoning to decree the execution of those we most fear and despise, it is not the reasoning expected from a United States District Judge. Nor should it be, for it violates the first rule of judging, that "[j]udicial choice, at its best, is reasoned choice, candidly explained." Robert E. Keeton, Judging 1 (1990). To explain further, however, would violate the confidentiality protocols I have knowingly entered to obtain the data upon which I now rely. This I cannot do. I profoundly regret it.

While it is my unavoidable duty to decide this and every case on the basis of the best data available to me, whether public or confidential, I am beginning to think that the loss of public confidence in the judiciary is simply too high a price to pay for judicial decisions resting on secret data. "The result is diminished reliance on and support for public processes." Judith Resnik, *Procedure's Projects*, 23 Civ. Just. Q. 273, 273 (2004).

Secret judicial decisions violate the judge's duty as trustee of publicly held values. Sarah M.R. Cravens, *Judges as Trustees: A Duty to Account and an Opportunity for Virtue*, 62 Wash. & Lee L.Rev. 1637, 1645-1646 (2005) ("It is the judge's duty, as a trustee, to maintain the integrity of the corpus of the common law .... To fully accomplish that aim, the judge must openly explain her ... reasoning so that the community understands it and so that it may be legitimately integrated into the tradition."); William O. Douglas, *Stare Decisis*, 49 Colum. L.Rev. 735, 739 (1949) ("The ... Court was ... faithful to the democratic tradition. I wrote in words that all could understand why it did what it did. That is vital to the integrity of the judicial process.").

© 2007 Thomson/West. No claim to original U.S. Govt. works.

More ominously, secret decisions mark an insider's elitism, "the judges' desire to safeguard their own prestige and status." William M. Richman, *Much Ado About the Tip of an Iceberg*, 62 Wash. & Lee L.Rev. 1723, 1728 (2005). In short, secret judicial actions "insult democracy." Arthur J. Jacobson, *Publishing Dissent*, 62 Wash. & Lee L.Rev. 1607, 1607 (2005).

Make no mistake. In this case I have relied on secret data to arrive at the dispositive finding. This is as reprehensible as though the entire decision were secret.

© 2007 Thomson/West. No claim to original U.S. Govt. works.